## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

UNITED STATES OF AMERICA and )
PEOPLE OF THE VIRGIN ISLANDS, )
 )
**v.** )
 )  **Criminal Action No. 2015-0036**
DWAYNE WESSELHOFT, )
 )
   **Defendant.** )
———————————————————)

**Attorneys:**
**Alphonso G. Andrews, Esq.,**
St. Croix, U.S.V.I.
 *For the Government*

**Kia D. Sears, Esq.,**
**Omodare B. Jupiter, Esq.,**
St. Croix, U.S.V.I.
 *For Defendant*

## <u>MEMORANDUM OPINION</u>

**Finch, Senior District Judge**

THIS MATTER comes before the Court on Defendant Dwayne Wesselhoft's "Motion to Suppress Statements and Physical Evidence," filed on January 22, 2016. (Dkt. No. 21). The Government filed an Opposition on February 5, 2016. (Dkt. No. 26), and the Court held a hearing on March 2, 2016. For the reasons that follow, Wesselhoft's Motion to Suppress will be granted in part and denied in part.

## I.  BACKGROUND FACTS

On November 17, 2015, Defendant Dwayne Wesselhoft ("Wesselhoft") was indicted in the District Court of the Virgin Islands on the following charges: Unlawful User of a Controlled Substance in Possession of Firearm/Ammunition—to wit, One Taurus 9mm Luger pistol, 50 Blazer 9mm Luger bullets, and 40 Remington 9mm Luger bullets—in violation of 18 U.S.C. §

922(g)(3) (Counts 1-3); Unauthorized Possession of a Firearm—a Taurus 9 mm Luger pistol—in violation of 14 V.I.C. § 2253(a) (Count 4); and Unauthorized Possession of Ammunition—to wit, 50 Blazer 9mm Luger bullets and 40 Remington 9mm Luger bullets—in violation of 14 V.I.C. § 2256(a) (Counts 5, 6). (Dkt. No. 1). Wesselhoft was released on bond (Dkt. Nos. 10, 11), and was arraigned on December 2, 2015. (Dkt. No. 14). On January 22, 2016, Wesselhoft filed the instant Motion to Suppress, asking that "all physical evidence and statements illegally taken or flowing from the illegal seizure of Mr. Dwayne Wesselhoft and subsequent search of his property by law enforcement officers" be suppressed, as they were obtained in violation of his constitutional rights. (Dkt. No. 21).

At the March 2, 2016 suppression hearing, U.S. Drug Enforcement Agency ("DEA") Special Agent Jeremy Latchman; High Intensity Drug Task Force ("HIDTA") Officer Sydney Elskoe; and Bureau of Alcohol, Tobacco and Firearms ("ATF") Special Agent Travis Strickland, testified for the Government. Timothy Barnes testified for the Defendant.

### A.  Testimony of Special Agent Jeremy Latchman

Jeremy Latchman ("Latchman"), a DEA Special Agent for approximately five years, testified that he arrived at Defendant's home, located in Clifton Hill, St. Croix, at approximately 10:00 to 10:15 a.m. on October 1, 2015. (Transcript of Suppression Hearing, Dkt. No. 37, at 5, 6). He went to that address in connection with a "follow-up investigation" in relation to information his office received about marijuana distribution and use from that property. *Id.* at 6. Latchman stated that seven officers in three different vehicles, one of which was marked, parked two or three houses down from the property, which he described as a single story structure with a chain link fence around it and an attached carport on the right side. *Id.* at 6-7. Latchman asserted that he, HIDTA Task Force Officer Sydney Elskoe ("Elskoe") and DEA Resident Agent in Charge Wesley

Fritz ("Fritz") walked through the open gate and up the driveway leading to the carport, toward three individuals sitting at a table under the carport. *Id.* He was not wearing a uniform, although he was wearing a vest with a DEA insignia on the front and back. His firearm was at his side, in view. *Id.* at 7. The other four officers who arrived with Latchman remained at the chain link fence at the end of the driveway. *Id.* at 13.

Latchman and the other agents walked up to the individuals, who appeared nervous. He noticed "a strong odor of marijuana," and observed that two of the individuals—not Wesselhoft— "appeared to be rolling a cigar, later determined to be [a] marijuana cigar." *Id.* at 8, 9.  The three agents introduced themselves; Elskoe explained that they were there conducting an investigation of marijuana use on the property. *Id.* at 9. The two individuals rolling the cigar responded that they did not live at the property and that "they don't do any of that stuff, all they do is smoke." *Id.* at 10. Wesselhoft stated that he resided there with his girlfriend and young child. *Id.*

Latchman observed a covered wooden bowl on the table and asked if he could look inside the bowl. The two individuals (not Wesselhoft) said yes, and he saw marijuana inside the bowl. *Id.* at 10-11. He then asked Wesselhoft for permission to conduct a search of the residence. Wesselhoft said yes, as long as he could go in with the officers. *Id.* at 12. Latchman characterized the tone of voice he used when speaking to Wesselhoft as being "casual conversation. It wasn't high pitched." *Id.*

Wesselhoft—who was on crutches—Latchman and Fritz walked through the door leading from the carport into the house; Fritz stayed with Wesselhoft while Latchman cleared each bedroom. *Id.* at 13. In one of the bedrooms, Latchman saw marijuana on the nightstand next to the bed—which Wesselhoft described as his "smoking weed"—and several empty packaging baggies in a yellow box. *Id.* at 14-16. As Latchman turned to face the closet, he saw a green and white box

with "Remington 9mm" inscribed on the side. *Id.* at 16-18. He asked Wesselhoft if a firearm was present with the ammunition. Wesselhoft "hesitated for a couple of seconds" and stated that a firearm was also on top of the closet. *Id.* at 17. Latchman noticed a black bag next to the ammunition and asked if the firearm was in the black bag; Wesselhoft responded affirmatively, and Latchman asked for permission to take the bag down and look inside. Wesselhoft answered "sure." *Id.* The black bag contained a Taurus 9 mm handgun with one 15-round magazine inserted; a second 15-round magazine; a black Colt holster; and an additional 20 loose rounds. *Id.* at 19-20. Latchman also found 40 rounds inside the Remington box. *Id.* at 21-22. He called Elskoe to take photographs of the items. *Id.* at 19. When asked by Latchman whether he had a license to possess the firearm, Wesselhoft responded "no." *Id.* at 23.

After he was placed under arrest and seated in the police car, Wesselhoft was handcuffed and Latchman gave him *Miranda* warnings from a preprinted "Advice of Rights" form. (Gov't Ex. 7). Although Latchman asked him to sign the form, Wesselhoft responded that he understood his rights but was not going to sign anything. *Id.* at 23-26. They traveled to the DEA office, and Latchman and Elskoe escorted Wesselhoft to a conference room there. They offered him water and he used the bathroom. *Id.* at 27-28. Prior to the interview, Latchman advised Wesselhoft that they were required to either videotape or audio record the interview unless he specifically declined on a "Recording Declination" form. Elskoe read each item on the form to Wesselhoft, who asserted that he did not want the interview recorded and signed the form. (Gov't Ex. 8). Latchman and Elskoe signed as witnesses. *Id.* at 27-29.

Prior to the interview, Latchman "again advised Wesselhoft of his *Miranda* warnings. Using the same form as earlier, [he] went through the form again." Wesselhoft acknowledged his understanding of the contents of the form but said he would not sign it. Latchman indicated that

Wesselhoft "refused to sign" at 10:55 a.m., and he and Elskoe witnessed the form. *Id.* at 29-30. Latchman stated that the 10:55 a.m. notation represented the time when he initially advised Wesselhoft of his *Miranda* warnings in the vehicle. *Id.* at 30.

Wesselhoft had no questions about his rights, did not ask to speak to an attorney, and agreed to speak with Latchman and Elskoe. *Id.* at 31. When asked how he acquired the firearm, Wesselhoft first said he found it in 2013 while walking on Princesse beach and buried it in an abandoned housing complex. He added that he had recently brought it to his home to use for protection. Latchman responded that if the firearm had been buried so long, its condition would have deteriorated. At that point, Wesselhoft "changed his story" and stated that he acquired the firearm from "Ali" who lived in Mt. Pleasant. He also stated that he kept the firearm because he had also been shot in 2010 or 2011, but just didn't license it. The interview lasted thirty to forty-five minutes. *Id.* at 31-33.

Latchman described his tone of voice during the interview as the same tone of voice he was using during the suppression hearing. He said that both he and Elskoe removed their firearms during the interview as a safety measure. At the end of the interview, Wesselhoft was processed and then released from custody. *Id.* at 33-34.

On cross-examination, Latchman admitted that, while numerous photographs had been taken during the search, no photograph was taken of the marijuana cigar. *Id.* at 36-37. He also stated that the two individuals who were at the table under the carport were also arrested. *Id.* at 37.

## B. Task Force Officer Elskoe

Officer Sydney Elskoe testified that he had been assigned as a HIDTA Task Force Officer for six years; his parent agency was the Virgin Islands Police Department where he had been employed for twenty-two years. *Id.* at 40-41. He asserted that his office had received a tip regarding

illegal drug use at Wessehoft's house. *Id.* at 42. He and six other officers and agents drove to the location, parking two or three houses shy of the residence. He, Latchman, and Fritz entered the property through an open gate and encountered three people sitting at a table under the carport. *Id.* He walked up to them, said good morning, and advised them that they were there because they had received a report of drug use at the residence in the presence of young children. *Id.* at 42-43. "As a group," the individuals responded "very calmly," saying "hey, we don't cause any trouble, but we do smoke marijuana." *Id.* at 43-44. Elskoe asked who lived there. Wesselhoft responded that he lived there with his girlfriend and small child; the two other individuals said they did not. According to Elskoe, Latchman then asked Wesselhoft if they could look around the residence and Wesselhoft agreed. *Id.* at 44. Wesselhoft, Latchman and Fritz entered the residence, while Elskoe remained outside with the two other individuals. The remaining officers were behind them in the vicinity of the gate, while Officer Strickland positioned himself to the right of the residence as a security measure. Elskoe's tone of voice was "very calm" when he spoke with the three individuals. *Id.* at 45.

Approximately ten to fifteen minutes later, Latchman asked Elskoe to bring his camera because he had found evidence to be photographed. Latchman pointed out a box of ammunition at the top of the bedroom closet, as well as a black bag. Latchman told him that Wesselhoft had advised him that the black bag contained a pistol. They took the bag down and found a Taurus 9mm pistol, twenty loose rounds, two magazines each containing fifteen rounds, and a cloth holster in it; a box of ammunition was near the bag. They laid the items on a chair, and Elskoe photographed them, after which the evidence was bagged and marked. They also collected a small amount of marijuana next to the bed. *Id.* at 47-48. Wesselhoft was advised of his rights, handcuffed, and placed in the police vehicle. *Id.* at 48.

Once Wesselhoft arrived at the office, Latchman and Elskoe stated that they would electronically record the interview unless Wesselhoft declined to have it recorded. Elksoe read the declination form to Wesselhoft, who confirmed he understood each line, and then signed the document. Elskoe and Latchman witnessed the form. *Id.* at 49-50. Wesselhoft was again given his *Miranda* warnings from the Advice of Rights form. He reviewed the form but declined to sign it. *Id.* at 52. Elskoe witnessed the form, after which he and Latchman interviewed Wesselhoft for approximately 30-45 minutes. During the interview, they offered him water and allowed him to use the rest room. Their tone of voice during the interview was "very calm." At the conclusion of the interview, Wesselhoft was processed and released. *Id.* at 52-53.

### C.  ATF Special Agent Steven Strickland

The final Government witness was Steven Strickland, an ATF Special Agent for over ten years. *Id.* at 58-59. He testified that, on October 1, 2015, he had been asked to join other agents who were investigating a "DEA tip." The agents went to the residence in the hope of conducting a consent search; he was asked to assist in providing perimeter security. *Id.* at 60. Strickland stated he was carrying a Glock model 22, .40 caliber semi-automatic handgun that was holstered while the agents were at the residence. *Id.* at 67. Strickland walked up the driveway, past the carport, and stationed himself at the right rear corner of the property to ensure that no one could harm the agents conducting the investigation. *Id.* at 60-62. While he was standing there, he saw two black pots in which marijuana plants were growing. The plants were collected as evidence. *Id.* at 62-63.

### D.  Timothy Barnes

Wesselhoft called Timothy Barnes as a witness. Barnes, 21 years old, testified that he lived down the hill from Wesselhoft in Clifton Hill and was friends with him. He had arrived at Wesselhoft's house twenty to thirty minutes before the agents arrived, and was sitting at the table

under the carport with Wesselhoft and "Raseem" when he saw police running to the house. *Id.* at 68-69, 97. He asserted that six or seven agents "bust open" the closed gate and came onto the property, "us[ing] force" to "push the gate open." *Id.* at 75-76. Barnes described one officer as carrying a "machine gun" or "assault rifle," not pointed at anyone; the rest of the officers had their handguns on their waist, with their hands on them. *Id.* at 79-80, 103.

Some of the agents approached them, asked "where['s] the weapon," told them to stand up, and searched him and Raseem; Wesselhoft was wearing only boxers. *Id.* at 77-78. Other agents went behind the house. *Id.* at 76-77. Once they were searched, the agents again asked where the weapon was, but no one answered. The agents opened a bowl on the table without asking permission to do so, and found some marijuana roaches inside. *Id.* at 78-79.

Barnes said three or four officers went into the house without asking Wesselhoft for permission to enter. *Id.* at 82-83. Wesselhoft later went inside the house. *Id.* at 84. After the agents told Barnes and Raseem that they were under arrest, Raseem's mother arrived. *Id.* at 85-86. The agents did not allow her to come into the yard. Raseem and Barnes started walking over to her. She asked if they could leave; the agents said no, and told Raseem and Barnes to sit back down. *Id.* at 87.

After being processed and released, Barnes returned to Wesselhoft's house and noticed that the glove compartment of one of the cars on the property had been opened and all the papers had been strewn around. *Id.* at 88, 107. He did not hear the officers ask for permission to search the yard, *id.* at 92, and did not see any officers search the car. *Id.* at 105.

On cross-examination, Barnes said he had not been smoking marijuana or drinking that morning. *Id.* at 98. He stated the gate to the property had a latch with a hook on top. While the latch did not have a lock on it, he described the gate as both closed and locked. *Id.* at 100. He stated

8

the encounter that day was frightening to him, but he had not discussed what had occurred with Wesselhoft. *Id.* at 112.

## II.    DISCUSSION

As previously noted, Wesselhoft seeks to suppress "all physical evidence and statements illegally taken or flowing from the illegal seizure of Mr. Dwayne Wesselhoft and subsequent search of his property by law enforcement officers," as they were obtained in violation of his constitutional rights. (Dkt. No. 21). The Government maintains, on the other hand, that the physical evidence was obtained as a result of a consensual search, and that Wesselhoft's statements are admissible either because they were not made in response to custodial interrogation, or were made after he received his *Miranda* warnings. (Dkt. No. 26).

This case raises a number of issues: the parameters of the "knock and talk" exception to the warrant requirement; whether there was consent to open the bowl on the table; whether there was consent to search the house; and whether Wesselhoft waived his *Miranda* rights. The Court will address each issue in turn.

### A.  The Knock and Talk Exception; Entering the Property

#### 1.  Legal Standard

The Fourth Amendment protects individuals from "unreasonable searches" in their homes. U.S. Const. amend. IV. A search occurs when the government (1) physically intrudes on constitutionally protected areas or (2) invades an expectation of privacy that society recognizes as a reasonable expectation. *See Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013); *Kyllo v. United States*, 533 U.S. 27, 33 (2001). "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (internal quotation omitted). Courts "regard the area 'immediately

surrounding and associated with the home'—what [] cases call the curtilage—as 'part of the home itself for Fourth Amendment purposes.'" *Jardines*, 133 S. Ct. at 1414 (quoting *Oliver v. United States*, 466 U.S. 170, 176 (1984)); *accord Estate of Smith v. Marasco,* 318 F.3d 497, 518 (3d Cir. 2003) ("Fourth Amendment protections extend not only to a person's home, but also to the curtilage surrounding the property."). The carport here, attached to the home, is clearly part of the curtilage. *United States v. Perea-Rey*, 680 F.3d 1179, 184 (9th Cir. 2012).

 "[I]t is not a Fourth Amendment search [for a government officer] to approach the home in order to speak with the occupant." *Jardines*, 133 S. Ct. at 1416 n.4. This is based on the premise that society has traditionally granted visitors an implied license to enter a property to reach the front door of a home. *See id.* at 1415 (citing *Breard v. Alexandria*, 341 U.S. 622, 626 (1951)). Thus, it is reasonable conduct—and not an unreasonable "Fourth Amendment search"—when a police officer enters private property but remains within the scope of what society permits any private citizen to do on another person's curtilage. *See id.* at 1415-16 ("[A] police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'") (quoting *Kentucky v. King*, 131 S. Ct. 1849, 1862 (2011)); *Marasco*, 318 F.3d at 519 (a police officer may "knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants just as any private citizen may").

These principles are embodied in the "knock and talk" doctrine, according to which a law enforcement officer lacking a warrant may enter private property, proceed to the front door, and attempt to speak to the occupants about an investigation, without offending the Fourth Amendment. *Marasco*, 318 F.3d at 519 (noting that officers are entitled to use the "knock and talk" strategy); *see United States v. Claus,* 458 F. App'x 184, 188 (3d Cir. 2012) (recognized purposes behind "knock and talk" procedure include "either speak[ing] with occupants or ask[ing]

10

for consent to search. As a result, no objective level of suspicion is required."); *United States v. Butler*, 405 F. App'x 652, 656 (3d Cir. 2010) ("[C]onsistent with the Fourth Amendment, police may employ the so-called 'knock and talk' technique as a tool to investigate criminal activity" where law enforcement officials "approach a dwelling—typically, that of a person suspected of some criminal activity—and try to obtain either an occupant's consent to enter (thereby coming within the consent exception to the warrant requirement) or at least to obtain information from an occupant that might enable police to make the requisite evidentiary showing needed to secure a warrant.").

Ultimately, for an officer to avail himself of the "knock and talk" exception, both his initial entry onto the property and his conduct on the property must be reasonable; that is, his conduct must not objectively indicate that the officer's purpose was to initiate a warrantless search instead of engaging the inhabitants. *See Jardines*, 133 S. Ct. at 1417 (an officer's entry onto the curtilage with a drug-sniffing dog violated the Fourth Amendment because his "behavior objectively reveal[ed] a purpose to conduct a search"); *United States v. Coles*, 437 F.3d 361, 370 (3d Cir. 2006) ("knock and talk" doctrine did not apply where officers' conduct of misleading occupants into believing they were not police officers to gain entry into apartment "demonstrated that the police had no intention of merely investigating matters further or perhaps obtaining consent to search").

## 2. Analysis

### a. Credibility

The analysis of most of the issues involved in the Motion to Suppress depends on what version of events the Court believes, as the accounts by the three Government agents conflict with Barnes' testimony on key points—such as how the agents came onto the property, how they

interacted with Wesselhoft, Barnes, and Raseem, whether those three individuals had been smoking marijuana, and whether the agents received Wesselhoft's consent to search the house. Thus, the Court is required to make credibility determinations. *See United States v. Richardson*, 501 F. Supp. 2d 724, 734 (W.D. Pa. 2007) ("[A]t a hearing on a motion to suppress, the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge.") (citations and internal quotation marks omitted).

The Court credits the agents' testimony concerning how events unfolded. Their account of what transpired that morning was consistent and believable. None of the agents who testified attempted to avoid any questions or tailor their responses to hide the kind of improper actions that Barnes attributed to them. Not only does it strain credulity to believe Barnes' account, but the Court notes that Barnes has a substantial personal interest in testifying to unlawful police conduct, and to his own innocent conduct of not smoking or drinking that morning, because he was also arrested that day. If the Court credited his version of events—which describe blatant Fourth Amendment violations—all of the evidence gathered from the agents' entry onto the property would be suppressed in the prosecution of Barnes' friend Wesselhoft. In addition, Barnes' prosecution would rely on some of the same evidence proffered in this case. If the Court found his account credible, it would not require an inferential leap to conclude that the same evidence would be suppressed in his related case as well. For these reasons, the Court finds the agents' testimony credible, and Barnes' testimony incredible. *See United States v. Boyce*, 2015 WL 856943, at *8 (D.V.I. Feb. 26, 2015) ("'At a suppression hearing, as the finder of fact, the Court determines the credibility of witnesses and may accept or reject any or all of a witness' testimony.'") (quoting *United States v. Davis,* 2014 U.S. Dist. LEXIS 48843, at *9 (W.D. Pa. Apr. 9, 2014)).

**b. Parameters of the Knock and Talk: Agents Latchman, Elksoe, and Fritz**

Wesselhoft argues that the agents' entry beyond the closed gate was impermissible under the "knock and talk" doctrine, and that the agents should have stood outside the gate and spoken to the three men from that location, as there was "no need to come through the gate to talk to them." (Dkt. No. 37 at 124). This argument lacks merit.

Under the "knock and talk" doctrine, the agents were permitted to enter through the open gate and approach the individuals in the carport.[1] Such conduct would be within the implied invitation granted to any visitor when coming to a house and wishing to speak to the occupants of the property. *See Carman v. Carroll*, 749 F.3d 192, 198 (3d Cir. 2014), *rev'd on other grounds* 135 S. Ct. 348 (2014); *United States v. Walker*, 799 F.3d 1361, 1363-64 (11th Cir. 2015) (approaching carport did not exceed geographic limit of knock and talk exception, and officers had reason to believe that occupant of house was there).

Wesselhoft also asserts that the agents' intent in coming onto the property was to conduct a search, which is not permitted under the "knock and talk" doctrine. *Id.* at 121-22. The Court rejects this argument as well.

The fact that the agents were investigating a possible marijuana selling operation at the property and wished to talk with the occupant(s) in the hope that they would be allowed to perform a consent search, does not transform their approach up the driveway, through the gate, and into the carport into a Fourth Amendment violation. Indeed, as indicated above, the law permits a "knock

---

[1] Even if the gate was closed and latched, opening such a gate to access property does "not trigger Fourth Amendment concerns associated with warrantless, nonconsensual entries onto curtilage." *Claus*, 458 F. App'x at 188 (upholding police officers' opening of and entry through a closed chain-link gate to reach front porch for a "knock and talk"); *see United States v. Lubrin,* 2015 WL 361796, at *6 (D.V.I. Jan. 28, 2015) (holding that officers did not violate Fourth Amendment by passing through a closed, unlocked gate and approaching house in order to conduct "knock and talk" with resident of house).

and talk" entry for the purpose of obtaining information from an occupant necessary to secure a search warrant or for the purpose of seeking consent to search. *See Coles*, 437 F.3d at 370 (observing that a permissible purpose for a "knock and talk" is to obtain consent to search); *Claus*, 458 F. App'x at 188.[2]

Here, the objective reasonableness of Latchman, Elskoe, and Fritz's entry onto the property and their interaction with Wesselhoft, Barnes, and Raseem, placed their conduct squarely within the scope of the "knock and talk" doctrine. *See Jardines*, 133 S. Ct. at 1416 n.4 ("The mere purpose of discovering information . . . in the course of engaging in [the] permitted conduct [of approaching the home in order to speak with the occupant] does not cause it to violate the Fourth Amendment."); *United States v. Holmes*, 2014 WL 10679855, at *10 (M.D. Fla. Aug. 8, 2014) (detective's behavior objectively revealed purpose to knock on door and ask questions about complaint of drug dealing at residence with the hope of getting answers or possible consent to search, not to enter his porch and sniff around, look through the windows, or poke around the planters as occurred in *Jardines*). The Court finds that their conduct was within the parameters of the "knock and talk" doctrine and did not violate Wesselhoft's Fourth Amendment rights.

c. **Agent Strickland**

Although Agent Strickland initially entered the property with the other agents, their paths literally diverged. Strickland explained his presence as follows: "The U.S. Drug Enforcement Administration was going to attempt to conduct a consent search of a residence and asked for my

---

[2] This case, where agents were pursuing a lawful objective, differs from those cases where the evidence revealed that the officers were not interested in talking with the occupants or seeking to conduct a consent search, but only seeking to have an excuse to come onto the property to conduct a warrantless search from the curtilage. *See Jardines*, 133 S.Ct. at 1416 n.4, 1417 (officer's entry into curtilage with drug-sniffing dog violated Fourth Amendment because his behavior "objectively revealed a purpose to conduct a search" and holding that "no one is impliedly invited to enter the protected premises of the home in order to do nothing but conduct a search.").

assistance to provide perimeter security on the outside of the residence while they attempted to conduct their search." *Id.* at 60. His goal was "to make sure no one entered the backyard or emerged from the backyard that could possibly do harm to the agents who were conducting the investigation." *Id.* at 61-62. The Court finds Strickland's actions discrete enough from the actions of Latchman, Elskoe and Fritz to warrant a separate analysis under the "knock and talk" doctrine.

Wesselhoft argues that the fact that Strickland walked to the back of the property to provide security indicates an intent to search that exceeded the scope of a "knock and talk" and, as a result, the marijuana plants he saw from that vantage point, which were collected as evidence, must be suppressed. *Id.* at 122. While the Court does not agree with that argument, it will suppress the marijuana plants on another ground.

By walking off the driveway and away from the carport, and heading directly to the back corner of the property, Strickland deviated from the path that courts have found acceptable for officers to travel when approaching a residence to conduct a "knock and talk" encounter. Although officers have a right enter the curtilage while executing a 'knock and talk,' this right does not "necessarily extend[ ] to the officers the right to enter [elsewhere] into the curtilage." *Marasco*, 318 F.3d at 520; *see also Carman*, 749 F.3d at 199 (intrusion could not be justified as a knock and talk when officer proceeded directly to back of property, rather than to area where he ordinarily would encounter residents); *cf. Marasco*, 318 F.3d at 519-20 (rejecting the "sweeping proposition" that officers may proceed to the back of a home when they do not receive an answer at the front door any time they have a legitimate purpose for approaching the house in the first place."). While Latchman, Elskoe, and Fritz's actions objectively comported with the "knock and talk" doctrine, Strickland's actions exceeded the "scope of what society permits any private citizen to do on another person's curtilage" and thus his warrantless entry into the back corner of the yard

15

constituted a Fourth Amendment violation. *Jardines*, 133 S. Ct. at 1415. Consequently, the Court will grant in part Defendant's Motion to Suppress to the extent that it will suppress the two marijuana plants collected as evidence. *Jardines*, 133 S. Ct. at 1418 (affirming suppression of evidence for violation of knock and talk doctrine).

### B. Search of the Covered Bowl

Based on Barnes' testimony, Wesselhoft argues that the agents searched the wooden bowl on the table without consent, and therefore the marijuana found there must be suppressed.  (Dkt. No. 37 at 127). The Court agrees, but for a reason different from the one proffered by Wesselhoft.

According to Latchman, early in his conversation with the three individuals, he ascertained that Raseem and Barnes did not live on the property—they were "just visiting"—and that Wesselhoft lived there with his girlfriend and young child. *Id.* at 10. Latchman *then* asked permission to look inside the covered wooden bowl on the table. The "two other individuals besides Mr. Wesselhoft" said yes. He and Elskoe opened the bowl and observed marijuana inside. *Id.*

As indicated above, under the Fourth Amendment, a warrantless entry into and a search of a person's home is presumptively unreasonable, although consent is a well-established exception to the warrant requirement. *Claus*, 458 F. App'x at 189. Voluntary consent must be obtained either from the individual whose property is searched, or from a third party who possesses common authority over the premises. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). Common authority rests "on mutual use of the property by persons generally having joint access or control for most purposes[.]" *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974). A cohabitant of the property, for example, may provide the requisite consent. *United States v. Stabile*, 633 F.3d 219, 231 (3d

Cir. 2011). The burden of establishing common authority rests with the Government. *Rodriguez*, 497 U.S. at 181.

Here, the record clearly shows that two people who the agent was told did not live at the residence gave consent to search the bowl. The Government offered no evidence demonstrating that Barnes or Raseem had "joint access or control for most purposes" over the property. *Matlock*, 415 U.S. at 171 n.7. Accordingly, the Court will grant Defendant's Motion to Suppress to the extent that it will suppress the marijuana found inside the wooden bowl.

### C. Search of the Residence

Wesselhoft claims, again citing Barnes' testimony, that after the agents searched Barnes and Raseem, opened the bowl without consent, and demanded to know where the gun was, they proceeded to search the house without consent. (Dkt. No. 37 at 127). He also argues that he, Barnes, and Raseem were seized in the carport, given the number of officers present, who had their hands on their handguns "in an intimidating fashion"; given Strickland's position at the back of the property to provide security so that no one could leave; and given the patdown of Raseem and Barnes, who were told to sit back down when Raseem's mother arrived. *Id.* at 132. He concludes that all of the evidence discovered in the house, and all of statements made, must be suppressed as a result of an illegal seizure and warrantless search of the residence without consent.

The Government counters that Wesselhoft, while standing on his property, freely and voluntarily gave his consent to search his home. Moreover, Wesselhoft was not restrained and the officers did not raise their voices or brandish weapons. There was nothing coercive about the setting, and thus there was no Fourth Amendment violation. *Id.* at 115-16.

1. **Legal Standard: Seizure**

The Fourth Amendment prohibits unreasonable searches and seizures, and requires that "searches and seizures be founded upon an objective justification." *United States v. Smith*, 575 F.3d 308, 312 (3d Cir. 2009) (quoting *United States v. Mendenhall,* 446 U.S. 544, 551 (1980)). However, "not every interaction between a police officer and a citizen is protected by the Fourth Amendment. An encounter 'will not trigger Fourth Amendment scrutiny unless it loses its consensual nature. . . 'Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Id.* (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). Thus, whether a citizen's encounter with a police officer constitutes a search and/or seizure under the Fourth Amendment "requires consideration of 'all the circumstances surrounding the encounter.'" *Id.* (quoting *Bostick*, 501 U.S. at 439). Any seizure inquiry "has two steps: Was there in fact a seizure? If so, was that seizure reasonable?" *Id.* at 313.

In *Mendenhall,* the Supreme Court listed several factors indicative of a seizure: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." 446 U.S. at 554. The Court clarified the test in *California v. Hodari D.*, 499 U.S. 621 (1991) such that a seizure "requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority." *Id.* at 626. "The simple act of an assertion of authority by an officer is insufficient to transform an encounter into a seizure without actual submission on the part of the person allegedly seized." *Smith*, 575 F.3d at 313. The test for the existence of a show of authority is an objective one: "whether the officer's words and actions would have conveyed that to a reasonable person." *Hodari D.*, 499 U.S. at 628.

### 2.  **Analysis: Seizure**

As indicated above, the Court credits the agents' testimony of what occurred that morning, which described a non-confrontational, consensual exchange among the three agents and Wesselhoft. Nothing about the encounter in the carport was threatening. There was no show of physical force, as the agents' weapons were holstered. *See United States v. Mathurin*, 2015 WL 394015, at *6 (D.V.I. Jan. 29, 2015) (opining that officer being visibly armed has '"little weight in the [seizure] analysis"' as presence of holstered firearm is unlikely to contribute to coerciveness of encounter absent active brandishing of the weapon) (quoting *United States v. Drayton*, 536 U.S. 194, 204, 205 (2002)). The agents did not touch Wesselhoft (or Barnes and Raseem), and Wesselhoft's liberty was not restrained in any way, while in the carport or the house. The agents' tone of voice was normal during this "knock and talk" encounter. The remaining agents were at the bottom of the driveway; although Strickland was positioned at the back corner of the house, there was no evidence that his presence threatened Wesselhoft in any way. Latchman requested Wesselhoft's permission to search the house. Wesselhoft agreed—and felt free to assert that he would allow a search only on condition that he accompanied the agents—a condition to which they agreed. Moreover, "the fact that the encounter in this case occurred on private property does not, without more, transform the encounter into an illegal seizure." *Mathurin*, 2015 WL 394015, at *6.

The Court concludes that, having examined the totality of the circumstances, there was no show of authority by the officers, no seizure, and no Fourth Amendment violation—either while Wessehoft was in the carport or in the house. *James v. City of Wilkes-Barre*, 700 F.3d 675, 680 (3d Cir. 2012).

### 3.   Legal Standard: Consent

An individual's voluntary consent to a search of his home is one of the clearly recognized exceptions to the Fourth Amendment's warrant requirement. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973). To justify a search based on consent, the Government bears the burden of proving that consent was freely and voluntarily given. *United States v. Price*, 558 F.3d 270, 277-78 (3d Cir. 2009). That burden is not satisfied by showing "a mere submission to a claim of lawful authority." *Florida v. Royer*, 460 U.S. 491, 497 (1983). "Fundamental to the concept of voluntariness is that valid consent must not be coerced." *United States v. Hynson*, 451 F. App'x 91, 94 (3d Cir. 2011). There is "'no talismanic definition of 'voluntariness,' mechanically applicable to the host of situations where the question has arisen.' Instead, we determine the voluntariness of a consent by examining the totality of the circumstances." *Price*, 558 F.3d at 278 (quoting *Schneckloth*, 412 U.S. at 224, 227). Factors to consider include "the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; . . . the use of physical punishment; 'the setting in which the consent was obtained[;] and the parties' verbal and non-verbal actions." *Id.* (quoting *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003)).

### 4.   Analysis: Consent

The Court has found the agents' testimony—that Latchman asked Wesselhoft whether he could search the house, and Wesselhoft responded affirmatively (with the caveat that he accompany the officers)—credible. (Dkt. No. 37 at 12). This non-confrontational interaction continued while Latchman and Wesselhoft were in the house: after noticing the ammunition, Latchman asked if there was a gun involved, Wesselhoft answered in the affirmative and told him

where it was, and Wesselhoft also gave Latchman permission to take a bag down from the closet (which contained the firearm) and look inside.

The circumstances here show no "signature signs of coercion," such as a "display of force" by the agents. *See United States v. Thach*, 411 F. App'x 485, 489 (3d Cir. 2011). In granting permission to search, Wesselhoft was not verbally or physically threatened by the agents; he was cooperative throughout the entire encounter. *See United States v. Kim*, 27 F.3d 947, 955 (3d Cir. 1994) (observing that if a defendant replied to the agents' request to search "readily" and was cooperative during the entire interaction, that was strong indication of voluntariness). Nothing indicates that his will was "overborne" such as would make his consent involuntary. Prior to the search and while the search was taking place, he was not handcuffed or told that he was under arrest. Nor does the record indicate anything suggesting that Wesselhoft's "ability to understand the consequences of consent was compromised by [his] background, education, or intelligence." *Thach*, 411 F. App'x at 489-90. Although the agents did not inform Wesselhoft of his right to refuse consent, that fact "does not negate the strong evidence of voluntariness." *Claus*, 458 F. App'x at 189; *see also Price*, 558 F.3d at 280 (where defendant was asked for consent as she stood on her own property, officers did not have guns drawn, no one threatened, coerced, or promised anything to her, and where her age, intelligence and education were average, every factor, other than not being advised of her right to refuse consent, favored a finding of voluntariness).[3] Thus, "[b]y entering and searching [Wesselhoft's] property pursuant to voluntary consent, the officers

---

[3] Although there was no testimony regarding how long the search lasted, the agents arrived on the property between 10:00 and 10:15 a.m., and gave Wesselhoft his first *Miranda* warnings, while he was in the police car, at 10:55 a.m. Thus, the *entire* encounter took less than an hour. In addition, Latchman's testimony indicates that he asked Wesselhoft only three questions while the search took place, which Wesselhoft answered.

committed no Fourth Amendment violation and appropriately seized [the firearm, ammunition, and marijuana] they discovered." *Claus*, 458 F. App'x at 190.

Given that Wesselhoft's consent to search his home was voluntarily and freely given, the search did not violate the Fourth Amendment and the Court will not suppress any evidence discovered in the residence. *Kim*, 27 F.3d at 955 (opining that when an individual gives consent to search his property, "any evidence discovered during such a search may be seized and admitted at trial."). Similarly, because there was no Fourth Amendment violation, any statements Wesselhoft made during the course of the search are not fruits of an allegedly unconstitutional seizure and will not be suppressed. *See United States v. Thompson*, 2007 WL 4390435, at *3 (E.D. Pa. Dec. 14, 2007) (finding that if search did not violate Fourth Amendment, statements made by defendant during course of search were not fruits of the poisonous tree).

### D.  Admissibility of Wesselhoft's Statements

Wesselhoft moves to suppress statements that he made during the interview, contending that his refusal to sign the Advice of Rights form on which the *Miranda* rights were printed indicates that he did not waive his *Miranda* rights.  (Dkt. No. 37 at 130-31).

#### 1.  Legal Standard

The Fifth Amendment provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court established the now well-recognized legal principle that under the Fifth Amendment the "prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444. *Miranda* warnings are required when a suspect is "(1) 'in custody' and (2) subject to 'interrogation'

by the [g]overnment." *United States v. Dupree*, 617 F.3d 724, 731 n.7 (3d Cir. 2010) (citations omitted). A suspect is "in custody" when "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).

A person may "waive effectuation of these [*Miranda*] rights, provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444; *see also United States v. Pruden*, 398 F.3d 241, 246 (3d Cir. 2005). "Once a defendant challenges the admissibility of any statements made while in custody, the government must prove [by a preponderance of the evidence] that the defendant was advised of and understood [his] *Miranda* rights and that he . . . validly waived those rights." *United States v. Briscoe*, 69 F. Supp. 2d 738, 741 (D.V.I. 1999), *aff'd in part, rev'd in part on other grounds*, 234 F.3d 1266 (3d Cir. 2000); *see also Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986); *Pruden*, 398 F.3d 241 at 246 (voluntariness of waiver established by showing "that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it") (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)); *see also United States v. Whiteford*, 676 F.3d 348, 362 (3d Cir. 2012).

To determine whether *Miranda* rights have been voluntarily, knowingly, and intelligently waived, courts must "consider the totality of circumstances surrounding [the defendant's] statement." *Briscoe*, 69 F. Supp. 2d at 741 (quoting *United States v. Tyler*, 164 F.3d 150, 158 (3d Cir. 1998)). Specifically, courts must consider "the background, experience, and conduct of the [defendant], as well as any indicia of coercion." *Id.* (citing *Oregon v. Bradshaw*, 462 U.S. 1039, 1046 (1983)). Examples of "traditional" indicia of coercion are "the duration and conditions of

detention, the attitude of the interrogators, defendant's physical and mental state, and other pressures affecting his powers of resistance and self-control." *Id*. at 741 n.1 (citing *Colorado v. Spring*, 479 U.S. 564, 573-74 (1987)).

### 2. Analysis: Waiver of *Miranda* Warnings

Latchman and Elskoe testified that Wesselhoft was advised of his *Miranda* rights twice: the first time after he had been arrested and was sitting in the police car, and the second time at the DEA office before he was interviewed.[4] On both occasions, Wesselhoft stated he understood the rights which had been read to him from the Advice of Rights form, but would not sign the form waiving his rights. Latchman wrote "Refused to Sign" on the form, which he and Elskoe witnessed, and indicated Wesselhoft's refusal occurred at 10:55 a.m.—the time when Wesselhoft initially refused to sign. Wesselhoft did not ask to speak to an attorney, and agreed to speak with Latchman and Elskoe.

Despite that testimony, Wesselhoft argues that because he refused to sign the Advice of Rights form, the Court should infer that his refusal indicated that he did not waive his *Miranda* rights—and that he was actually invoking those rights. According to Wesselhoft, that argument is made stronger by the fact that he affirmatively signed the declination form, which showed that he was "very selective" about what he chose to sign and what rights he chose to waive. (Dkt. No. 37 at 130-31).

The evidence demonstrates that Wesselhoft stated he understood his rights, which had been read to him twice from the Advice of Rights form. After the second reading, he volunteered to speak to the agents, thereby "freely decid[ing] to forgo those rights." *New York v. Quarles*, 467 U.S. 649, 654 (1984). Nothing in Latchman's or Elskoe's testimony indicated that Wesselhoft's

---

[4] It is undisputed that Wesselhoft was in custody when he was given *Miranda* warnings.

background, experience or conduct impacted his ability to understand the rights he was waiving, or that his physical or mental state was weakened such that any resistance he may have had to speaking with the agents was overborne. Nothing in their testimony indicated that Wesselhoft was coerced into waiving those rights in an atmosphere of intimidation or deception. The agents permitted him to use the bathroom and gave him water. They removed their weapons while they were in the room. The tone of Latchman's voice was normal and calm, and the interview lasted 30-45 minutes.

The Court also rejects Wesselhoft's argument that his signing the declination form and not signing the Advice of Rights form indicated that he was not waiving his *Miranda* rights. That is simply an unsupported inference, belied by the actual evidence. Moreover, case law provides that the fact that a defendant refuses to sign the Advice of Rights form does not mean that he did not waive those rights. In *North Carolina v. Butler,* 441 U.S. 369 (1979), the Supreme Court wrote that providing that "[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." *Id.* at 373. Numerous courts in the Third Circuit—examining the circumstances presented in each case—have opined that a defendant's refusal to sign the waiver form did not require a conclusion that there was no waiver. *See United States v. Velasquez*, 626 F.2d 314, 320 (3d Cir. 1980) (holding in case where defendant was given *Miranda* warnings, refused to sign waiver of rights form, but nonetheless agreed to answer questions and never attempted to request counsel or terminate the questioning, that such behavior constituted an implied waiver under *Butler*); *United States v. Dixon,* 1998 WL 408820, at *4 (E.D. Pa. July 16, 1998) (finding that

defendant's agreement to answer police questions, despite not signing *Miranda* waiver form, indicated that defendant had knowingly waived his rights); *United States v. Filiberto*, 712 F. Supp. 482, 487 (E.D. Pa. 1989) (after defendant was given *Miranda* warnings, he refused to sign a waiver but nevertheless responded to police questions without invoking right to counsel or to remain silent; finding no violation under *Miranda;* and refusing to suppress responses to police questioning). Accordingly, given the circumstances here, the Court finds that Wesselhoft's waiver of his *Miranda* rights was voluntary, knowing, and intelligent.

The Court will therefore deny Wesselhoft's Motion to Suppress to the extent that he seeks to suppress the statements he made to the agents.

### III.    CONCLUSION

For the reasons set forth above, the Court will grant in part and deny in part Defendant Dwayne Wesselhoft's Motion to Suppress. The Court will grant the motion to the extent that it will suppress the marijuana discovered inside the wooden bowl and the two marijuana plants discovered in Wesselhoft's back yard. The Court will deny the motion to the extent that Wesselhoft seeks to suppress the other evidence discovered during the search and to the extent that Wesselhoft seeks to suppress his statements to the agents.

An appropriate Order accompanies this Memorandum Opinion.

Date: April 8, 2016                                        _____/s/_____
                                                          RAYMOND L. FINCH
                                                          Senior District Judge